BOWMAN et al. v. STARK et al. (No. 966.)*

(Court of Civil Appeals of Texas. Amarillo. April 19, 1916. Rehearing Denied May 10, 1916.)

1. HOMESTEAD  216—TRUST DEEDS—PROPERTY SUBJECT — BUSINESS HOMESTEAD — "AUXILIARY" — FINDINGS OF JURY — CONSTRUCTION.

A finding that an uptown office of wholesale grain dealers was used as an auxiliary to and in connection with the plant which they claimed exempt from a trust deed as their business homestead, is not inconsistent with a finding that the uptown office was their principal place of business as wholesale grain dealers; "auxiliary" meaning simply to confer aid or help.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 400–403; Dec. Dig.  216.]

2. HOMESTEAD  36—BUSINESS HOMESTEAD.

The essentials of a business homestead to exempt it from the lien of a trust deed of the

---

owner's property are that the owner shall be the head of a family and have a calling or business to which the place is adapted and reasonably necessary.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. § 56; Dec. Dig. ☞36.]

3. HOMESTEAD ☞216—BUSINESS HOMESTEAD —FINDINGS OF JURY—EFFECT.

Where the findings of the jury import that the place of business claimed exempt as a business homestead from the lien of a trust deed is not used as the principal business, but only as an incident thereto, the holder of the trust deed is entitled to a judgment on the findings foreclosing the mortgage lien.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 400–403; Dec. Dig. ☞216.]

4. HOMESTEAD ☞216—BUSINESS HOMESTEAD —ELECTION.

While the owner of a business may have the right to elect, if he is engaged in two businesses, which he will hold as his business homestead, a finding of the jury that his principal place of business was one and not the other, shows an election.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 400–403; Dec. Dig. ☞216.]

Appeal from District Court, Collin County; C. F. Spencer, Judge.

Suit to restrain sale of property under power of a deed of trust by J. T. Stark and another, composing the copartnership of the Stark Grain Company, against G. W. Bowman and another, in which defendants filed a cross-petition for foreclosure of the trust deed. From the judgment rendered, defendants appeal. Reversed and remanded, with instructions.

W. R. Abernathy, of McKinney, for appellants. Wallace Hughston and G. R. Smith, both of McKinney, for appellees.

HUFF, C. J. J. T. Stark and L. B. Stark, members of the copartnership of Stark Grain Company, instituted this suit against the Plano National Bank of Plano, Tex., and G. W. Bowman, trustee, in certain deeds of trust and chattel mortgages given by the Stark Grain Company and J. T. Stark, and L. B. Stark, setting up that certain property, described in the two deeds of trust, was the business homestead of J. T. and L. B. Stark, and that the bank and Bowman, as trustee, were about to sell the same under the powers of the deed of trust, and sought an injunction to restrain the sale of the property.

The appellees, plaintiffs below, allege that they were engaged in the business of cleaning, clipping, scouring, shelling, grinding and storing grain for hire, and that the property described in paragraph 2 of the petition constituted the business homestead and workshop and that appellees were each heads of families living in the town of Plano, alleging other facts necessary to constitute the property their business homestead.

The appellants, as defendants below, denied that this was the business homestead of the appellees at the time of the execution of the deed of trust, or either of them, or since said time; also claiming that this property was partnership property of the Starks, which consisted of other members than the appellees; that if the appellees were entitled to a business homestead that the same was located in the town of Plano and at an uptown office of the Stark Grain Company, and L. B. and J. T. Stark, and that such uptown office constituted their business homestead, and that they were engaged in the wholesale grain business. They also filed a cross-petition asking to foreclose the mortgage or deed of trust liens against the property in question, together with other property, which indebtedness amounted to $21,096.45.

The case was tried before a jury, and upon special issues submitted to the jury. Upon the findings of the jury, the trial court, together with certain other findings filed by the court, rendered judgment foreclosing the lien on certain other property and establishing a debt of several thousand dollars against the Stark Grain Company, and the appellees, and another member of the partnership.

The appellants herein asked a specially requested charge of the trial court to the effect that they find that the property in question was not the business homestead of appellees, and also made a motion that the trial court render a judgment in favor of the appellants against appellees, foreclosing the lien on the property in question. The court overruled the requested charge and motion and rendered judgment to the effect that the property was not subject to the mortgage lien.

On the 22d day of June, 1910, the Stark Grain Company, J. T. Stark, and L. B. Stark executed a mortgage and deed of trust on the property in question together with other property and that in 1912 they also executed another mortgage and deed of trust to secure other indebtedness upon the same property. These instruments were signed by the appellees, and at the time of executing the mortgages, neither of the Starks represented or claimed to the appellants that the property in question was their business homestead. The property in question is situated on what is known as the St. Louis & Southwestern Railway reservation in the town of Plano, and on the north side of the track, or right of way, which is designated in this record as the Cotton Belt.

J. T. Stark is the father of L. B. Stark, and both resided in the town of Plano at the time of the execution of the mortgages, each having a residence and each being the head of a family. The lots upon which their business and residences were situated and the leasehold from the railroad, without improvements on the property, were worth less than $5,000, at the time of placing the improvements thereon, or since said time. Each of the appellees were and are heads of families and resided in their respective residences in the town of Plano. J. T. Stark, since 1894, has been using part of the reservation or plot

of land in question for the purpose of handling grain, having thereon a warehouse and machinery necessary for treating grain in course of transportation.

In 1906 the Stark Grain Company erected the principal part of the plant that is now situated on this plot of ground. Prior to and up to 1908, the J. T. Stark Grain Company was a corporation, but it went into voluntary liquidation, and J. T. Stark purchased the property of the corporation, since which time it has been run as a partnership under the name of the Stark Grain Company, composed of the father, J. T. Stark, and his son, L. B. Stark, and another son, who died after the institution of this suit, and a younger son, who became a member of the partnership about a year before the suit. Mr. Stark says that he gave each of his sons, as they became of age, an interest in the business.

The appellees testified that they were in the grain and elevator business, which consisted in cleaning, scouring, clipping, storing, and mixing wheat and oats, shelling, grinding, and storing corn on the property in question. There is located on the plot of ground a steel elevator, which was called the head house, containing the machinery necessary to do the work and some small bins for storage in that building. There are six steel storage tanks, connected by conveyers to the main house; also a power house, which is a brick building, consisting of three rooms, in which rooms a boiler and engine and fuel are placed, and other necessary machinery and equipment. There is also what is known as the corn sheller house, which has two corn shellers, and other machinery necessary to clean the corn, scales for weighing, etc. They have also what is termed the corncrib house, where corn was placed before it was shelled and was connected with the sheller by machinery. They also have on this ground a warehouse, which seems to be used as a general storehouse for storing grain or machinery and other things when necessary.

The testimony of the appellees is that they claim this plot of ground, together with the improvements thereon, as their business homestead, and did so at the time the mortgages were executed, but admit they did not tell the appellants that they were so claiming it. The material out of which the several business houses were constructed, the kind, class, power, and use of the machinery and its several parts, are given in detail and the manner in which it is fastened to the ground is described as being by iron, brick, wood, and concrete.

The appellees' testimony shows that they clipped and cleaned their own grain, and also for the public, giving the scale of prices, and show also that they did nothing at the plant above mentioned besides cleaning, storing, and clipping grain.

The evidence in this case shows that the appellees and the Stark Grain Company maintained an office in the business portion of the town of Plano. This office is about half a mile from their plant, and that there was a private telephone wire between the office and the plant. At the office the company had about $1,500 worth of office furniture, consisting of telephone, typewriters, and other necessary office fixtures for a modern office. Each of the appellees, J. T. and L. B. Stark, maintained a desk in this office. They also had employed for 8 or 9 years a stenographer at this office. From this office they did their correspondence, made their contracts, sent their telegrams, made their communications to various points by phone, kept their books, drew their drafts, and paid checks and drafts, and bought grain. The evidence also shows that they were extensive dealers in grain, buying and selling; that their grain purchases amounted from $750,000 to over $1,000,000 a year; that about 50 per cent. of the grain purchased by them was from wagons and farmers at Plano, while the other portion of their purchases was carload lots from various portions of North Texas, some in the Panhandle, in Oklahoma and Kansas City, and other cities; that 90 per cent. of the grain purchased by carload lots was shipped to Plano for cleaning and improving for resale. These purchases made by them were made by wire, by letters in person, and by telephone communication. In addition to maintaining the plant on the plot of ground above mentioned in Plano, they maintained a warehouse at that place, on the Houston & Texas Central Railway, which appears to have been the first building used by the company when it first started in business. They also possessed and maintained an elevator in the town of Allen, in Collin county, for the purpose of storing and cleaning grain, and the testimony also shows that they had leased and rented elevators in several other towns and places, at which they placed buyers to purchase grain. The testimony also shows that they purchased futures on the Chicago Exchange, as they say, for the purpose of hedging on their contracts to deliver grain. The evidence also shows that J. T. Stark, while claiming to one of the bank officials that he had made $10,000 just previous to the time the bank sought to foreclose the mortgages, when pressed for payment, stated that he had also lost $4,000 on the Exchange.

The testimony shows that the property situated upon this plot of ground was of greater value than all the other property of which the appellees were possessed. The evidence shows that the object of keeping the town office was for the purpose of doing their clerical work, but the principal purpose was for the convenience of the appellees and that of its customers. The evidence shows that this office or place where the office is situated has been actually occupied by the Stark Grain Company for more than 16 years. It is shown that on the office a sign was

painted, "Stark Grain Company, Wholesale Grain."

It is shown by appellees' testimony that the idea of cleaning and clipping grain, etc., through the elevator after it was purchased, was to improve it so that it could be sold for a higher price and make it better.

J. T. Stark says:

"The difference what we bought it at, less our expense of running it through the elevator, and what we sold for would be profit. It was put through the elevator to make it more merchantable and worth more money and sell for more than it would in the natural state."

It was shown also that J. T. Stark had an insurance business which he maintained at this office, but the principal purpose of this agency was to write insurance on the company's property, and that when he did so, the 15 per cent. commission which he was entitled to went to the company. If he wrote insurance for others than the company, which he says was not often, that he himself got the 15 per cent.

The process of cleaning, etc., necessary to the elevator business, was largely done by machinery, but in order to carry on the work, they maintained a foreman of the plant, and men from one to twenty. The foreman had the supervision of the work, and J. T. Stark says he superintended the foreman.

The evidence shows that the appellees visited the plant during the season from their office from once to three times a day. The testimony shows that there was no written lease from the railroad company introduced in evidence, but there was one in existence which J. T. Stark says was practically perpetual, or that they had the right to make it perpetual. However, by his testimony he admits at the termination of the lease that he could be required to move the property situated thereon within 30 days. The terms of the lease further than the above do not appear to have been given. The uptown office was a rented place—rented by the month.

The special issues submitted to the jury, together with their findings thereon, are as follows:

"How much does the partnership of the Stark Grain Company owe the Plano National Bank, as shown by notes and acceptances introduced in evidence? Answer: $21,096.45.

"(2) What are the dates of the two deeds of trust introduced in evidence? Answer: June 22, 1910. October 5, 1912.

"(3) In what business were the plaintiffs engaged at the time of the execution of the deeds of trust herein sued on? Answer: Wholesale grain dealers, also storing and improving grain.

"(4) What was the principal business in which the plaintiffs were engaged at the time of the execution of the deeds of trust sued on? Answer: Wholesale grain business, storing, improving grain for profit.

"(5) The evidence shows that J. T. Stark, one of the plaintiffs herein, was the agent of several insurance companies, and you are asked to say whether or not such business of writing insurance was for the purpose of writing their own insurance or for the purpose of doing a general insurance business. Answer: For the purpose of writing their own insurance.

"(6) What was the purpose of the plaintiffs in maintaining an office in the town of Plano away from and apart from the elevator plant? Answer: For the convenience of the Stark Grain Company, and the public in general.

"(7) For what purpose was the elevator plant and other appliances, houses, etc., used by the plaintiffs? Answer: For the purpose of storing and improving grain for profit.

"(8) Was the office uptown in Plano used as an auxiliary to and in connection with the plant, or was it used independently of the plant? Answer: It was used as an auxiliary to and in connection with the plant.

"(9) About how often would the plaintiffs, or either of them, visit the elevator plant daily from the uptown office during the grain season? Answer: From one to three times a day.

"(10) Could the plaintiffs better transact their business by maintaining an uptown office away from the plant, or not? Answer: Yes.

"(11) How and in what manner did the plaintiffs handle the grain; i. e., what did they do with such grain as they bought? Answer: They bought grain wholesale and retail lots, stored and improved for the market.

"(12) How long had the uptown office been maintained by the plaintiffs, or either of them? Answer: About 16 years.

"(13) How long had the plaintiffs, or either of them, held the lease on the lot on which the elevator plant is maintained? Answer: About 21 years.

"(14) When were the buildings and appliances placed thereon, i. e., on the land leased by the plaintiffs, or either of them? Answer: About 1894 to 1906.

"(15) In what way is the machinery and buildings attached to the land on which the plant is situated? Answer: Is attached to land by brick, concrete, and wood."

In answer to special issues requested by appellants the jury found:

"Special Issue (a): Where was plaintiffs and the Stark Grain Company's place of business? Answer: At his office.

"Special Issue (b): What did the Stark Grain Company and plaintiffs use the property claimed by them as a business homestead for? Answer: For storing and improving grain.

"Special Issue (c): Was the use to which plaintiffs and the Stark Grain Company put said property claimed by them as a business homestead their real business or merely incident to their real business? Answer: A part of their business."

[1] In answer to the requested special issue by appellant: "Where was plaintiffs' and the Stark Grain Company's place of business? Answer: At his office"—this answer was definite and distinct. The appellees claim the elevator and the other property, situated on the railroad right of way, as exempt. It has been held by the Supreme Court that the Constitution exempts one place where the business of the head of the family is transacted. If the jury had intended to find that the elevator was the place of business it occurs to us they would have said so. It is suggested by the appellees that the jury intended to find, or that the finding is susceptible of the interpretation, that the office named was that situated in the elevator. The answers of the jury to the preceding issues negatived any such purpose; and when the entire record of the evidence and the pleadings is examined, it is conclusive to our mind they had no such purpose. They answered that the business of the ap-

pellee was wholesale grain dealers, also storing and improving grain, and this was their principal business, which they were following for profit at the time the deeds of trust were executed. They state in answer to issue 8 that the office was used as an auxiliary to and in connection with the plant. They find that the appellees visited the plant from one to three times a day, that they could better transact the business by maintaining the uptown office, and as they bought grain they stored and improved it for market, and that they had maintained this office for 16 years. From all the answers it is evident to our minds they found this office, which had been maintained for 16 years, was the place of appellee's business. Perhaps the only ambiguity in their answer is to the eighth issue, in which they answer it was used as an auxiliary to and in connection with the plant. The finding that it was used in connection with the plant is not repugnant to the idea that the office was the owner's place of business, nor is it inconsistent with the fact that the office was the place of business. Auxiliary simply means conferring aid or help. The aid or help conferred in this instance was upon the plant, and not upon the business of buying grain, storing and improving grain for profit. The office was the business place. It will be noted the testimony of the appellees sought to show the business they were in was the "grain and elevator business, which consisted of cleaning and scouring, clipping, and storing and mixing wheat and oats; shelling, grinding, and storing corn." While on the other hand appellants sought to show appellees were engaged in the wholesale grain business, buying grain and improving it for the market, and to derive thereby a profit upon resale as well as a profit upon the bargain. The jury did not find the office was auxiliary to the elevator business, but only that it was a help to the plant. The jury, it occurs to us, were careful to find that the business was "wholesale dealers, storing and improving grain for profit." This business had a place, and that place was the office they had theretofore been talking about. The jury found that in answer to the issues (b) and (c), requested by appellants, that storing and improving grain was "a part of their business"; it was not the whole. The whole had a place where the heads of the families, composing a part of the firm of Stark Grain Company, exercised their calling and business. For 16 years they had so exercised that business at the same place—the office.

[2] The two requisites essential, as stated by our Supreme Court, were found by the jury: First, the head of the family must have a calling or business to which the place is adapted and reasonably necessary. The appellees were wholesale dealers in grain, storing and improving grain; second, the appellee's place of business was the office. Storing and improving grain was not their business, but only a part of the business. The office was adapted and reasonably necessary to buy grain over Texas, Oklahoma, in Kansas City and other cities, as well as to superintend the cleaning and storing of grain so purchased. It was necessary to have the office situated in a business portion of the town for the company's convenience and that of the public. The findings of the jury negatived that the elevator property was used as the place of business by the appellee, and that their business consisted alone of cleaning and storing grain. The findings also negative the idea that it was adapted to the purpose of the business of wholesale dealers, etc.; as a place for such business it was not adapted or reasonably necessary.

[3] The verdict of the jury amounts to the finding that the appellees had not established their allegation that the property in question was the business homestead, and for that reason the deeds of trust void. We believe the trial court should have sustained the appellants' motion for a judgment on the findings of the jury, and foreclosed the mortgage lien on the property. McDonald v. Campbell, 57 Tex. 614; Rock Island Plow Co. v. Alten, 102 Tex. 366, 116 S. W. 1144; Pfeiffer v. McNatt, 74 Tex. 640, 12 S. W. 821; Shryock & Rowland v. Latimer, 57 Tex. 674; Hinzie v. Moody, 1 Tex. Civ. App. 26, 20 S. W. 769; Harrington v. Mayo, 130 S. W. 651.

[4] It is urged by the appellees if they were engaged in more than one business at different places they had the right to elect which place should be exempt to them as a business homestead. This may be conceded to be a correct proposition. They, however, can have but one place, and, the jury having found that the office was that place, have shown by their verdict and finding that the appellees have made their election.

There are a number of other assignments which we deem it unnecessary to discuss under the disposition we make of this case. As to the findings of the trial judge, which in some measure we believe conflict with the findings of the jury, we will not at this time discuss. We believe the motion of the appellants for judgment on the verdict, as rendered, and under the undisputed facts, should have been granted. The case will therefore be reversed, with the instruction that judgments be rendered, foreclosing the mortgage lien upon the property in question; and as to the receivership and orders therein, the court will make such orders therein as shall be just, right, and equitable in the premises.

Reversed and remanded, with instructions.